RYAN SHAW,

        Plaintiff,

        v.                                             Case No. 23-cv-1015-bhl

DREW DELFORGE, et al.,

        Defendants.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

    Plaintiff Ryan Shaw, who is incarcerated at Green Bay Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on Eighth Amendment claims based on allegations that he received constitutionally inadequate dental care. On May 15, 2024, Defendants moved for summary judgment as well as for leave to file more than the 150 proposed statements of fact allowed by the local rules. For the reasons explained below, the Court will grant in part and deny in part Defendants' summary judgment motion.

### PROCEDURAL ISSUES

    Civil Local Rule 56(b)(7) prohibits a party from filing proposed statements of material fact "in excess of the limit set forth in this rule unless the Court previously has granted leave upon a showing that an increase is warranted." On May 15, 2024, Defendants moved for leave to file proposed statements of fact in excess of the 150 proposed facts allowed by the rule. Defendants filed 210 proposed facts—60 more than is allowed by the rule—and their filing comprises forty-three pages. Defendants filed their motion *with* their proposed statements of fact, assuming, it seems, that the Court would grant their motion. Defendants explain that "due to the nature of the

case, the allegations against each defendant, and the need for expert opinions, counsel believes [more than] 150 Proposed Statements of Fact is necessary." Dkt. No. 23.

Defendants' boilerplate explanation for needing 40% more proposed findings of fact than the rule allows is insufficient. Defendants highlight the "nature of the case" and the "allegations against each Defendant," but the nature of the case is straightforward. Indeed, Shaw's complaint is only *five* pages long and he was able to explain how he repeatedly asked that his tooth pain be addressed, but Defendants ignored him or downplayed the severity of his symptoms. Defendants also highlight the need for expert opinions, but the only declarations provided in support of summary judgment are from the Defendants. The Court understands that it is easier to simply include every detail relevant to a claim, but Defendants' failure to limit their submission to "*material* facts . . . that entitle [them] to a judgment as a matter of law," Civil L. R. 56(b)(1) (emphasis added), threatens to prejudice the pro se plaintiff and waste the time and resources of the Court. To avoid delay and because Shaw diligently responded to each of Defendants' proposed facts, the Court will grant Defendants' motion for leave to file 60 additional proposed facts, but Defendants' counsel is cautioned to follow the requirements of Civil L. R. 56(b)(1) in all future cases. If counsel believes that a particular case is one of the few in which it is truly not possible to do so, she should seek leave to exceed the prescribed number well *before* filing a motion for summary judgment. A repeat of the current practice will not be tolerated.

Also, on September 19, 2024, Plaintiff filed a motion for an extension of time to file a sur-reply. Dkt. No. 39. The rules do not offer parties the opportunity to file a sur-reply. Briefing of a motion is considered complete upon the filing of the moving party's reply brief, which Defendants filed on August 23, 2024. Plaintiff offers no explanation why he believes a sur-reply

is needed or warranted, so the Court will deny his motion and will strike the sur-reply he filed along with his motion.

## SUMMARY JUDGMENT BACKGROUND

At the relevant time, Shaw was housed at Fox Lake Correctional Institution. Dr. Drew Delforge and Dr. Christopher Rauch worked as dentists at Fox Lake, and Lisa Albrecht worked as the assistant nursing supervisor/assistant health services manager at Fox Lake. On March 4, 2022, about two weeks after being transferred to Fox Lake, Shaw submitted a dental services request stating that he wanted to have some cavities filled. In assessing the request, Dr. Delforge reviewed Shaw's dental records and learned that a dentist at Shaw's previous institution had recommended on January 5, 2022, that Shaw have tooth #30 extracted. Dr. Delforge also noted that Shaw had been placed on the routine waitlist to have several teeth restored with fillings. The routine waitlist is used for dental conditions such as cavities, where a delay in treatment would not result in a serious health risk or discomfort to the patient. Because Shaw made no mention of pain, Dr. Delforge continued Shaw's placement on the routine waitlist and informed Shaw that he would be called based on the date he had made his request at his previous institution, *i.e.*, January 5, 2022. Shaw did not object to his placement on the routine waitlist because, at that time, he was not experiencing any pain. Dkt. Nos. 22, 32 at ¶¶1-4, 21, 39-42.

About three months later, on June 13, 2022, Shaw submitted a dental services request stating that his teeth were hurting and he needed his cavities filled. Shaw also requested ibuprofen and Tylenol. Dr. Delforge responded that he would send the medication to his unit, and he added Shaw to the essential waitlist, which is reserved for patients with a chronic condition that is asymptomatic and that, if not addressed, could result in an "acute episode." Asymptomatic may mean the patient is not experiencing any symptoms or that the patient is not experiencing

3

symptoms all the time. Patients on the essential waitlist are typically seen within eight weeks. Dkt. Nos. 22, 32 at ¶¶23-24, 43-44.

The next day, on June 14, 2022, Dr. Delforge prescribed ibuprofen for three days and an antibiotic for ten days. A couple of days later, Dr. Delforge examined Shaw, who complained of sensitivity throughout his mouth. Dr. Delforge noted caries (decay), which are generally treated during a routine waitlist appointment (as opposed to an essential waitlist appointment). He also noted an abscess on tooth #30, consistent with the prior dentist's findings. Dr. Delforge believed that, because tooth #30 had significant decay and was infected from the pulp to the tip of the root, the tooth could not be restored. He also notes that, for various reasons, including DOC policy, a molar root canal was not indicated. Dr. Delforge asserts that he advised Shaw that extraction of tooth #30 would eliminate the source of the infection. Shaw insists that he was not complaining about pain in tooth #30, but about pain in his other teeth with cavities. Shaw refused to have tooth #30 extracted. Dkt. Nos. 22, 32 at ¶¶49-76

About a month and a half later, on July 28, 2022, Shaw submitted another dental services request stating that he has "an abs[cessed] tooth and need[s] an antibiotic & something for the pain." Dr. Delforge responded, again explaining that the abscess was on tooth #30, which needed to be extracted due to the infection. He stated that he could not provide just an antibiotic because an antibiotic would reduce the infection, but it would not eliminate it. He stated that Shaw must have the tooth extracted to address the infection. A couple days later, on August 1, 2022, Shaw submitted another dental services request stating that he did not want the tooth extracted at this time, so no appointment was necessary. He again requested an antibiotic and pain medication. Dr. Delforge directed Shaw to his prior response and informed him that, per policy, he could obtain pain medication from the canteen since he was refusing to have the tooth extracted as

4

recommended.  Shaw now asserts that he was not complaining about pain or infection in tooth #30 but was complaining about pain and infection in tooth #21.  Shaw's dental services requests do not indicate that he was complaining about a tooth other than tooth #30, which, up until then, had been the focus of Dr. Delforge's interactions with Shaw.  Dkt. Nos. 22, 32, 33 at ¶¶56, 77-79; Dkt. No. 24-1 at 14, 15.

A month later, on September 4, 2022, Shaw submitted a dental services request asking how long it would be until he could get his fillings.  He noted that he had been waiting since December 2021 (although he was in fact first placed on the routine waitlist in January 2022).  Dr. Delforge responded that they were understaffed and that he could not give him an estimate of how much longer he would have to wait, but he told him he was number 80 out of 200 on the routine waitlist.  Shaw did not mention that he was in pain.  Another month passed, and on October 9, 2022, Shaw filed another dental services request.  He stated he needed "dental care for [his] fillings" because "they are hurting a lot."  He asked to see Dr. Delforge, who again confirmed Shaw was on the routine waitlist for fillings and reminded him that he had refused to have tooth #30 extracted.  He told Shaw to write back if he changed his mind about the extraction.  Dkt. Nos. 22, 32 at ¶¶80-81; Dkt. No. 24-1 at 17.

Shaw submitted yet another dental services request about a month later, on November 14, 2022, explaining that he was not concerned about the tooth that needed to be pulled; he was writing about the fillings that he had been waiting for since the end of last year.  He stated that those teeth were "causing lots of pain."  Dr. Delforge explained that the institution has "<u>very limited dental coverage due to short staffing</u>."  He also informed Shaw that he was now 37 out of 208 on the routine waitlist.  Dr. Delforge explains that he did not move Shaw from the routine waitlist to the essential waitlist because, although he indicated he was in pain, he did not describe symptoms such

5

as swelling that might indicate an acute episode. A few days later, Shaw stated in a dental services request that he needed the fillings because he was in "a ton of pain" and "could [not] sleep due to the pain." He noted that this was "an urgent matter," and highlighted that he had been waiting since last year. He concluded with, "Help me!" Dr. Delforge confirmed with Shaw that he was on the list for fillings and noted that, if the pain is so great that it affects sleeping, then extraction may be indicated. He instructed Shaw to write back if he desired that. Dr. Delforge asserts that increased pain did not necessarily mean the infection in tooth #30 had spread. Dkt. Nos. 22, 32 at ¶¶83-87; Dkt. No. 24-1 at 19.

In early December 2022, Shaw filed two dental services requests explaining again that he was in significant pain and asking for the fillings for which he had been waiting for a year. He noted his concern that if he continued to wait, his teeth may be too rotted to benefit from the fillings. He highlighted that this was an "urgent" concern. Dr. Delforge directed Shaw to his prior responses and noted that he is at the institution only part time. In mid- and late-January, in response to additional requests for fillings, Dr. Delforge informed Shaw that, per policy, fillings are not considered an urgent matter, and he reminded him that he has addressed this issue with him multiple times. But Shaw highlights that, per policy, "severe dental pain, that may interfere with your sleep" qualifies as an "emergency dental need." Dkt. Nos. 22, 32 at ¶¶88-90; Dkt. No. 24-1 at 22-24; Dkt. No. 33-1 at 36.

According to Albrecht, she first learned of Shaw's dental complaints on February 8, 2023. An institution complaint examiner sent an email to her and the health services manager, along with Shaw's inmate complaint about the delay in receiving dental care. After reviewing the materials, the health services manager forwarded Shaw's most recent dental services request and his inmate complaint to the dental director. The health services manager copied Albrecht on the email. The

6

dental director and the health services manager discussed Shaw's complaint and decided that Dr. Delforge needed to see Shaw for a limited dental examination. The health services manager instructed Dr. Delforge to examine Shaw on February 9, 2023. Dkt. Nos. 22, 32 at ¶¶91-95.

Dr. Delforge asserts that he examined Shaw for pain complaints in teeth #28, #29, and #30, but Shaw asserts that he complained about pain in teeth #20, #21, #28, and #29 that was preventing him from eating and sleeping; he clarifies that he never complained about pain in tooth #30. Dr. Delforge noted the abscess in #30, and Shaw continued to refuse extraction of that tooth. Dr. Delforge also noted sensitivity due to lesions in teeth #20, #21, #28, and #29. According to Shaw, Dr. Delforge told him that he did not have time to restore those teeth at the appointment, so instead, he applied a topical fluoride varnish, which is used to prevent tooth decay. Dr. Delforge also explained to Shaw that he may be experiencing referred pain from tooth #30, meaning that, although Shaw believed he was experiencing pain with teeth #20, #21, #28, and #29, the pain was actually caused by issues in tooth #30. Dr. Delforge prescribed ibuprofen for three days and an antibiotic for ten days. Dkt. Nos. 22, 32, 33 at ¶¶96-102.

A week later, on February 16, 2023, the institution complaint examiner asked Albrecht about another inmate complaint regarding a delay in dental treatment. Albrecht informed the institution complaint examiner that the institution had limited dental coverage due to being short-staffed, but she also informed her that Dr. Delforge had informed Shaw that, per policy, fillings were not an urgent need. As Shaw points out, Dr. Delforge did not acknowledge in his response that Shaw was experiencing significant pain that interfered with his ability to sleep and eat. Dkt. Nos. 22, 32, 33 at ¶¶103-105.

On March 10, 2023, Dr. Rauch reviewed a dental services request from Shaw stating that his teeth were causing him pain and problems sleeping. Dr. Rauch placed Shaw on the essential

7

list and scheduled him for an evaluation that day, at the request of the health services manager. Dr. Rauch asserts that Shaw pointed to the lower teeth between his canines and molars on both sides. Dr. Rauch explains that, although the x-rays did not show deep decay in the teeth, Shaw's complaints about extreme pain and interrupted sleep potentially suggested irreversible pulpitis, which means the soft tissues of the tooth pulp are inflamed. Dr. Rauch asserts that irreversible pulpitis cannot be repaired with fillings and in fact can make the pain greater because placing a man-made material in direct contact with the pulp tissue will cause inflammation. Typically, treatment of pulpitis begins with removing the cause of the inflammation, such as decay, but because Shaw's symptoms suggested irreversible pulpitis, Dr. Rauch believed that removing the decay would not reduce or eliminate the inflammation Shaw was experiencing. Dr. Rauch asserts that he explained to Shaw that fillings are provided in order of request and that the decay that was causing him sleepless nights would not be resolved with fillings. Dkt. Nos. 22, 32, 33 at ¶¶106-117.

Shaw describes their conversation slightly differently. According to Shaw, Dr. Rauch told him fillings were not an option that day and extraction was the only option he could offer that day. Dr. Rauch explained that, to be fair, fillings can only be provided in the order they are requested regardless of symptoms and circumstances. Shaw also highlights that Dr. Rauch's explanation that fillings would not address the decay causing him pain was incorrect, explaining that the eventual placement of fillings in teeth #20 and #21 resolved the inflammation and his pain. Dkt. Nos. 22, 32, 33 at ¶¶106-117.

Tooth #30 was only briefly discussed at the evaluation. Dr. Rauch asserts that Shaw knew tooth #30 needed to be extracted, but Shaw stated that the tooth was not causing him any pain and was his only "chewer," so he did not want it extracted. Shaw emphasizes that pain in teeth #20,

8

#21, #28, and #29 was his primary concern. Dr. Rauch maintained that, to be fair, he could not provide Shaw with fillings until it was his turn, so if he wanted to address the pain that day, extraction was his only option. Shaw refused to have any teeth extracted that day. Dkt. Nos. 22, 32, 33 at ¶¶118-123.

Less than a week later, Albrecht and the health services manager received an email from the institution complaint examiner, forwarding an email from the corrections complaint examiner asking for an update on Shaw's care. The health services manager informed the institution complaint examiner that Shaw had been seen by dentists on February 9 and March 10, 2023, and had refused to have his teeth extracted. Dkt. Nos. 22, 32 at ¶¶124-26.

Shaw continued to file dental services requests throughout March and April 2023, complaining of pain and asking for fillings. On May 5, 2023, Shaw stated in a dental services request that he could not eat or sleep, his face was swollen, and his head was pounding. Dr. Rauch put Shaw on the essential waitlist. Shaw filed two more dental services requests the next week with the same complaints. Dr. Delforge confirmed Shaw's placement on the essential waitlist and informed him a nurse would evaluate the pain and swelling. Dr. Delforge repeated that an extraction was indicated, and because he had refused that, the medication would not be renewed. Dkt. Nos. 22, 32 at ¶¶127-31.

On May 15 and 17, 2023, a nurse examined Shaw and observed that, contrary to his complaints, Shaw's gums and cheek were not swollen. She also noted that, consistent with his dental records, one bottom and one top tooth were broken and two bottom teeth had dark cavities along the gum line. Shaw indicated that he was okay with the bottom right tooth (tooth #30) being extracted. Shaw was given ibuprofen, which provided some relief, and he was offered an ice bag,

which he agreed to use. Shaw was instructed to request an extraction if that is what he wanted. Dkt. Nos. 22, 32 at ¶¶132-38.

Shaw continued to file dental services requests about his pain, swelling, and inability to eat or sleep. On May 26, 2023, Dr. Rauch evaluated Shaw and noted deep decay in tooth #20. Dr. Rauch believed that it was unlikely a filling would return the tooth to symptom-free health. He offered extraction, which Shaw refused. Dr. Rauch again explained that fillings would not be provided during an essential waitlist visit; otherwise, every "squeaky wheel" would be able to move up the routine waitlist past others patiently waiting their turn. Dr. Rauch also checked the routine waitlist and confirmed Shaw was near the top of the list, so he would not have to wait much longer for the fillings. Dkt. Nos. 22, 32, 33 at ¶¶138-48.

Over the next month, Shaw continued to submit dental services requests with the same complaints, and he received the same answers that he had been receiving for more than a year. *Finally*, on July 7, 2023, eighteen months after being placed on the routine waitlist, Shaw made it to the top of the list. But not every decayed tooth could be addressed at that one-hour appointment. Only teeth #15, #20, and #21 were restored with fillings, and, according to Shaw, the fillings eliminated the inflammation around teeth #20 and #21. Shaw was then placed back on the routine waitlist on July 10, 2023, to fill the remaining teeth. Shaw explains that he is still on the waitlist to have teeth #28, #29, and #3 restored with fillings. Dkt. Nos. 22, 32, 33 at ¶¶116, 149-62, 204.

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A

10

dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Shaw asserts that Dr. Delforge and Dr. Rauch violated his rights under the Eighth Amendment because they brushed off his increasingly desperate complaints of pain and persisted in offering extraction as the only treatment option. To prevail on a deliberate indifference claim under the Eighth Amendment, a plaintiff must prove that prison officials intentionally disregarded a known, objectively serious medical condition that posed an excessive risk to the plaintiff's health. *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citations omitted). The Seventh Circuit has clarified that, "[w]ithin the universe of deliberate indifference cases is a narrower category when a prisoner alleges not that his condition was ignored entirely, but that he received constitutionally deficient treatment for that condition." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019). These types of cases are "better framed not as deliberate indifference to a serious medical need, but as a challenge to a deliberate decision by a doctor to treat a medical need in a particular manner." *Id.* (internal punctuation and citations omitted). It has long been held that, in

such cases, courts must "defer to a medical professional's treatment decision 'unless no minimally competent professional would have so responded under those circumstances." *Id.* Further, it is important to note that a "disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment is generally insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (citations omitted).

The parties agree that Shaw's decayed teeth and accompanying pain were objectively serious conditions. The Court's decision will therefore focus on Dr. Delforge and Dr. Rauch's response to that condition. Defendants primarily argue that their hands were tied as to the timing of when Shaw received treatment. They explain that, per DOC policy, Shaw's need for fillings required that he be placed on the routine waitlist. They also explain that, to be fair, inmates are treated in the order they are placed on the list. This approach is strictly enforced to prevent manipulation of the list by allowing inmates who falsely complain of pain to skip over other inmates who follow the rules and patiently wait their turn. Defendants emphasize that there was a significant staffing shortage at the time Shaw sought treatment, and they had no control over the size of the list or the wait times inmates faced. Defendants also highlight that, when Shaw complained of increasing pain, they examined him and informed him that he could not receive the treatment he sought (fillings) until he reached the top of the routine waitlist. Defendants offered Shaw an alternative treatment—extraction—and limited medication to address his complaints of pain. Finally, Defendants assert that the objective findings—x-rays, examinations, and health records—were not consistent with Shaw's reports of pain, nor was there evidence of swelling or deep decay, which may have warranted immediate treatment.

Shaw does not dispute that his initial placement on the routine waitlist was appropriate because, at that time, he was not experiencing any pain. He also appears to agree that, given the

12

level of decay and infection, tooth #30 could not be restored with fillings. Still, despite tooth #30's condition, Shaw did not want to extract that tooth because he believed the tooth was not causing him any pain. Shaw was also hesitant to have the tooth extracted because it was the only tooth left on that side of his mouth that he could chew food with, and as Defendants note, he was not missing enough teeth to qualify for a lower partial denture. *See* Dkt. No. 22 at 157.

Shaw first began to complain of pain in June 2022, six months after he was added to the routine waitlist. At first, his complaints were somewhat mild and non-specific, but over time, they became increasingly desperate, with Shaw complaining that the pain was so severe that it was interfering with his ability to eat and sleep. He also complained of swelling in his gums and cheek and headaches. Although he did not do so at first, Shaw eventually clarified that the pain was not coming from tooth #30, but from other areas of his mouth. And, while Dr. Delforge and Dr. Rauch examined him several times, they persisted in telling him that, if he wanted the pain to stop, he could have the teeth extracted; otherwise, he would have to wait until he got to the top of the routine waitlist before they would make any effort to treat his teeth or address his pain. Dr. Rauch even appeared to encourage extraction, telling Shaw that fillings were not going to address the inflammation or pain. Shaw opted to wait. During that time, he received a few days of ibuprofen here and there, along with an ice pack on a couple occasions. Shaw was told that, because he did not want to have his teeth extracted, he was not entitled to pain medication while he waited for fillings. And so it was not until July 7, 2023, eighteen months after being added to the waitlist, that Shaw finally made it to the top. Unfortunately, making it to the top of the list did not provide Shaw with the complete relief he expected. Dr. Rauch explains that he was only able to put fillings in three teeth at Shaw's appointment, so he put him back on the routine list to wait for fillings in

the remaining teeth. According to Shaw, the fillings he received resolved the inflammation and pain in teeth #20 and #21.

A jury who believes Shaw's description of what he experienced could reasonably conclude that Dr. Delforge and Dr. Rauch's refusal to move him from the routine waitlist so that he could receive treatment other than extraction demonstrated deliberate indifference to his severe tooth pain. A jury could also reasonably conclude that, even if keeping Shaw on the routine list was appropriate, Dr. Delforge and Dr. Rauch demonstrated deliberate indifference to Shaw's condition by refusing to provide him with pain medication while he waited. Dr. Delforge and Dr. Rauch assert that they had no control over the length of the wait, but neither did Shaw, and Defendants offer no explanation why he should have to suffer in pain simply because the dental services unit has insufficient resources to timely address the needs of the inmates. Implicit in Dr. Delforge and Dr. Rauch's refusal to move Shaw to the essential list for treatment (as opposed to evaluation) and to provide him with pain medication while he remained on the routine waitlist is their disbelief of his complaints of pain. Both dentists note that the objective findings were not consistent with Shaw's subjective reports of pain, but whether Dr. Delforge and Dr. Rauch's refusal to move Shaw to a higher priority list or provide him with pain medication was based on a good-faith belief that he was malingering is an issue for the jury. *See Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002). Accordingly, Dr. Delforge and Dr. Rauch are not entitled to summary judgment.

Nor are Dr. Delforge or Dr. Rauch entitled to qualified immunity. Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a court reviews a defendant's motion for summary judgment

based on qualified immunity, the court considers "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether the constitutional right was clearly established at [that] time." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (citing *Pearson*, 555 U.S. at 232); *Estate of Clark v. Walker*, 865 F.3d 544, 549–50 (7th Cir. 2017).

Here, as noted above, "[t]he general standard for liability under the Eighth Amendment for refusal to treat a serious medical condition was well-established at the time of these events." *Walker*, 293 F.3d at 1040 (citations omitted). "And for the reasons already explained, the evidence viewed in the light most favorable to Shaw could allow for a jury to find in his favor. Under these circumstances, Dr. Delforge and Dr. Rauch are not entitled to qualified immunity. *See Chilcutt v. Santiago*, No. 22-2916, 2023 WL 4678583, at *3 (7th Cir. July 21, 2023) ("[A] district court properly denies a motion for summary judgment based on qualified immunity when the facts, viewed in the light most favorable to the plaintiff, create a genuine dispute about whether the defendants' actions violated a clearly established constitutional right.") (citing *Estate of Clark v. Walker*, 865 F.3d 544, 551 (7th Cir. 2017)).

But Assistant Health Services Manager Albrecht is entitled to summary judgment as no jury could reasonably conclude she had any personal involvement in the alleged violation of Shaw's constitutional rights. Albrecht merely responded to questions about Shaw's dental care. On two occasions, she was copied on correspondence from the institution complaint examiner to the health services manager, who then escalated Shaw's situation to the director of dental services and instructed the dentists to immediately evaluate Shaw. On the third occasion, she provided factual information to the institution complaint examiner about when Shaw was seen and what the dentists had concluded were the appropriate next steps. Albrecht does not review dental services

15

requests, nor was she aware of Shaw's submissions. In fact, she has never seen or met with Shaw for any medical or dental needs. She also is not responsible for staffing dental vacancies, nor does she have any direct supervision over the dentists or their treatment decisions. Finally, Albrecht does not have the experience or qualifications to determine how an inmate's dental needs should be addressed. Given that Albrecht had no personal involvement in the alleged violation of Shaw's constitutional rights, she is entitled to summary judgment. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("no prisoner is entitled to insist that one employee do another's job"); *Vance v. Peters*, 97 F.3d 897, 991 (7th Cir. 1996) (holding that, under §1983, a defendant must be personally involved to be liable).

## NEXT STEPS

Shaw's claims against Dr. Delforge and Dr. Rauch will proceed to trial. Given the difficulty of trying a case before a jury, including offering a coherent opening statement and closing argument, presenting and examining witnesses, and locating and introducing evidence, the Court will attempt to recruit a volunteer lawyer to represent Shaw at trial. The demand for volunteer lawyers is high, but the supply is low. Few lawyers have the time, ability, or experience to volunteer for cases such as these. The Court encourages Shaw to be patient as it makes efforts to recruit a lawyer to represent him at trial. The Court will promptly notify Shaw in the event a lawyer volunteers to represent him. In the meantime, the Court encourages the parties to explore whether settlement is possible.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' summary judgment motion (Dkt. No. 20) is **GRANTED in part** and **DENIED in part.** Shaw's claims against Lisa Albrecht are **DISMISSED**, so the clerk's office is directed to terminate her from this action.

**IT IS FURTHER ORDERED** that Defendants' motion for leave to file more than 150 proposed findings of fact (Dkt. No. 23) is **GRANTED**.

**IT IS FURTHER ORDERED** that Shaw's motion for an extension of time to file a sur-reply (Dkt. No. 39) is **DENIED**, and Shaw's proposed sur-reply (Dkt. No. 40) is **STRICKEN**.

Dated at Milwaukee, Wisconsin on November 1, 2024.

        s/ *Brett H. Ludwig*
        BRETT H. LUDWIG
        United States District Judge